■ In the Matter of BOR REALTY CORPORATION, Petitioner, v NEW YORK CITY LOFT BOARD et al., Respondents.—In a CPLR article 78 proceeding transferred to this court by order of the Supreme Court, New York County (Kenneth L. Shorter, J.), entered February 3, 1986, the petition of the BOR Realty Corporation seeking annulment of the order of the respondent Loft Board of the City of New York dated May 15, 1985, which determined that petitioner's premises at 32 East Broadway are an interim multiple dwelling covered under Multiple Dwelling Law article 7-C, is dismissed and the order is confirmed, without costs.

In this article 78 proceeding, petitioner BOR Realty Corp., owner of a loft building at 32 East Broadway, New York City, seeks annulment of an order of the New York City Loft Board which, after a hearing, determined that three units of petitioner's building were residentially occupied between April 1, 1980 and December 1, 1981, the relevant "window" period identified by Multiple Dwelling Law § 281 (1) (iii), and accordingly found the building to be "covered" as an interim multiple dwelling under article 7-C of the Multiple Dwelling Law. Specifically, petitioner challenges the Loft Board's order No. 227 finding that the seventh floor of petitioner's building was residentially occupied during the "window" period, and further finding that the Loft Board did not have to demonstrate that the floor was occupied as a primary residence during the "window" period.

The principal issue on this appeal is raised by the petitioner's contention that the construction of Multiple Dwelling Law § 281 (1) (iii) in the opinion of the Court of Appeals in *Matter of Lower Manhattan Loft Tenants v New York City Loft Bd.* (66 NY2d 298) requires that only sites occupied as a primary residence during the "window" period may be considered for jurisdictional purposes.

We agree that some language in the Court of Appeals

discussion of the legislative purpose of Multiple Dwelling Law article 7-C in *Matter of Lower Manhattan Loft Tenants v New York City Loft Bd.* (66 NY2d 298, *supra.)* taken out of context, provides support for the conclusion urged by petitioner. However, when the opinion is studied as a whole, we do not believe it to be dispositive of the issue presented here, an issue not presented in *Matter of Lower Manhattan Loft Tenants,* and one that the Court of Appeals did not have an opportunity to address after a full appellate presentation. A curious aspect of the issue presented is petitioner's claim that an opinion of the Court of Appeals that sustained a regulation of the New York City Loft Board, and did so essentially in accordance with the argument presented by the Board on behalf of the regulation's validity, necessarily requires striking down another regulation of the Loft Board, and one that the Loft Board believed, with good reason, to be quite consistent with the regulation sustained by the Court of Appeals.

At issue in *Matter of Lower Manhattan Loft Tenants (supra)* was the validity of Regulation J (1) (a), which permitted the landlord of an interim multiple dwelling registered with the Board to evict a residential occupant of a unit who had no lease or rental agreement with the landlord, on the ground that "the unit is not the primary residence of such residential occupant." As described by the Court of Appeals (66 NY2d, *supra,* at 302): "[t]he essence of petitioners' argument is that because article 7-C refers to a 'residential occupant qualified for protection' " but, unlike other statutes, did not make " 'primary residence' a qualification, and in defining an 'interim multiple dwelling' refers to 'residence or home,' the regulation constitutes an unauthorized extension of the statute."

Addressing that contention, the Court of Appeals focused on that part of Multiple Dwelling Law § 281 (1) defining "interim multiple dwelling" that in paragraph (iii) referred to a building or part of a building that on December 1, 1981 was occupied for residential purposes since April 1, 1980 as "the residence or home of any three or more families living independently of one another." Significantly, the Court of Appeals did not hold that the words "the residence or home", considered by themselves, had the same meaning as primary residence. Much more narrowly, the Court of Appeals said (66 NY2d, *supra,* at 304): "Ergo, 'the residence or home' as used in section 281, cannot properly be construed to exclude primary residence as a measure of its protection." In concluding that the phrase provided authority for the Loft Board regulation

there, in issue, the Court of Appeals relied primarily on the principle "that statutes in pari materia are to be construed together and 'as intended to fit into existing laws on the same subject unless a different purpose is clearly shown' " *(supra,* at 304). In this connection the court found that a comparison of article 7-C with article 7-B's "initial protection of loft-tenant artists who lived and worked in the same space" would produce an absurd result if petitioners' contention were to be adopted *(supra,* at 304).

Important to the question presented on this appeal is the court's description of the principle contended for by the petitioners in *Matter of Lower Manhattan Loft Tenants (supra).* Thus, the court defined petitioners' contention as a claim for protection of "a multiresidenced loft tenant, provided only that he or she makes some residential use of some part of the space * * * What petitioners seek by their construction is protection of commercial tenants who have separate residential space, a purpose not within the Legislature's 1964, 1977 or 1983 findings and declarations of purpose and not suggested by any of article 7-C's provisions" (66 NY2d, *supra,* at 304-305).

What emerges from a consideration of the opinion as a whole, notwithstanding some language that could be construed more broadly, is that the Court of Appeals agreed with the Loft Board that article 7-C was not intended to protect from eviction tenants who did not occupy residential premises as their primary residence, a special, indeed unique, protection that would have departed significantly from an already firmly established legislative policy embodied in other statutes in pari materia.

The issue on this appeal is quite different, and involves separate policy considerations. In Regulation I (A) (1), the regulation at issue here, the Loft Board was concerned with determining its jurisdiction under the definition of "an interim multiple dwelling" set forth in Multiple Dwelling Law § 281, and in particular the meaning for jurisdictional purposes of the words "the residence or home of any three or more families living independently of one another" set fort in subdivision (1) (iii). In substance, the regulation embodied the conclusion that for jurisdictional purposes the statutory language embraced space that had been converted to residential use, and was being occupied by someone as "the residence or home", even though it was not the "primary residence" of the person or persons so using it during the period stipulated by the statute.

Although there is a surface inconsistency between Regulation J (1) (a) and Regulation I (A) (1), we are persuaded that there is a rational basis for the different interpretations given by the Loft Board to the words "the residence or home" in the two regulations, which are clearly addressed to very different problems. The interpretation given a statute by an administering agency, "if not irrational or unreasonable, should be upheld." *(Matter of Howard v Wyman,* 28 NY2d 434, 438; *see also, Ostrer v Schenck,* 41 NY2d 782, 786.)

Preliminarily, as already pointed out, the Court of Appeals did not say in *Matter of Lower Manhattan Loft Tenants (supra)* that the words "the residence or home" are synonymous with the words "primary residence". The Court of Appeals quite clearly held that the meaning of the statutory language could differ, depending on the context in which the words were used and the relevant legislative purpose.

In this connection we find persuasive the Loft Board's argument that the Legislature did not intend the Board's jurisdiction with regard to otherwise qualified buildings to require multiple fact-finding inquiries as to whether spaces in fact adapted to residential use, and so used, were used during the statutorily defined period by the then tenant as his or her primary residence. As quite cogently argued in the Loft Board's appellate brief, such fact-finding inquiries would present extraordinary difficulties of proof because of the illegal nature of the initial occupancies of most loft residents.

Finally, as a matter of statutory construction, it is difficult to accept that the Legislature would not have said so explicitly if it had intended that the jurisdiction of the Loft Board with regard to otherwise qualified buildings was to turn on whether the requisite number of spaces that were in fact adapted to residential use, and so used, were occupied as the primary residence of each tenant. The term "primary residence" was a familiar one to the Legislature at the time article 7-C was enacted, and had a well-established meaning. Therefore, the omission of that term in a jurisdictional section may reasonably be believed to have been purposeful. The significance of the omission of that phrase in Multiple Dwelling Law § 281 (1) is not contradicted by, or even inconsistent with, the conclusion of the Loft Board, sustained by the Court of Appeals, that the Legislature did not intend to provide a special ongoing protection for tenants who did not occupy loft space as their primary residence, a protection not available to any other statutorily regulated tenants. Concur—Sandler, Milonas and Rosenberger, JJ.

Murphy, P. J., and Smith, J., dissent in a memorandum by Murphy, P. J., as follows: Article 7-C of the Multiple Dwelling Law, otherwise known as the Loft Law, was intended to help alleviate the acute shortage of residential housing in New York City (Multiple Dwelling Law § 280). Toward this end, the article provides a statutory framework to legitimize the residential use of space formerly devoted to commercial purposes, and to normalize and regulate relations between loft tenants and landlords. *(See, Anthony v New York City Loft Bd.,* 122 AD2d 725.) To come within the protective scope of article 7-C, and, therefore, within the jurisdiction of the Loft Board created and charged by the Legislature with the responsibility of administering the provisions of article 7-C (Multiple Dwelling Law § 280 *et seq.),* a building, or portion thereof, must have been occupied, for residential purposes between April 1, 1980 and December 1, 1981 (the "window period"), "as the residence or home of any three or more families living independently of one another." (Multiple Dwelling Law § 281 [1] [iii].) Once the Loft Board determines that these requirements have been satisfied, the building or qualifying part of the structure concerned is deemed an interim multiple dwelling. The landlord is then obligated to make whatever alterations are necessary to bring the affected units into compliance with safety and fire standards applicable to residential units, and to take any steps necessary to obtain a class A multiple dwelling certificate of occupancy for the residential portions of the building (Multiple Dwelling Law § 284). Thereafter, the units and the leases pursuant to which they are let are governed by the Emergency Tenant Protection Act of 1974 or, in the event of its expiration, the Rent Stabilization Law (Multiple Dwelling Law § 286 [3]).

The central question in the case presently before us is whether residential units must have been occupied as primary residences during the aforementioned "window period" to support a building's designation in whole or part as an interim multiple dwelling pursuant to Multiple Dwelling Law § 281 (1) (iii).

I agree with the majority that the Court of Appeals in *Matter of Lower Manhattan Loft Tenants v New York City Loft Bd.* (66 NY2d 298) was primarily concerned with the validity of Loft Board regulations sanctioning the eviction of tenants on grounds of nonprimary residency. This, however, should not obscure the fact that in sustaining the Loft Board's nonprimary residency eviction regulation the court specifically addressed the contention of the petitioners therein that the

jurisdictional provisions of the interim Multiple Dwelling Law defining "interim multiple dwelling" (Multiple Dwelling Law § 281) impose no primary residency requirement, and that since primary residency was unnecessary as a condition of unit coverage, neither was it necessary as a condition of tenancy thereafter. The court responded by construing the phrase "the residence or home" as it appears in Multiple Dwelling Law § 281 (1) (iii) in the following passage: "The word 'or' between 'residence' and 'home' suggests a distinction between 'residence' and 'home' which completely disappears when used, as it is in section 281 (1) (iii), as part of the phrase *'the* residence or home' * * * 'The', as Webster's Third New International Dictionary (at 2368) informs us, 'refers to someone or something that is unique * * * or exists as only one at a time.' Ergo, 'the residence or home' as used in section 281, cannot properly be construed to exclude primary residence as a measure of its protection." *(Matter of Lower Manhattan Loft Tenants v New York City Loft Bd., supra,* at 304 [emphasis in original].)

Section 281 of the Multiple Dwelling Law is *the* jurisdictional provision of the Loft Law. Obviously the court understood this when it stated that " 'the residence or home' as used in section 281, cannot properly be construed to exclude primary residence as a measure of its protection." *(Supra,* at 304.) A fair reading of the above-quoted passage then would seem to necessitate the conclusion that, according to the court, the scope of Loft Law coverage is, indeed, conditioned upon the primary residency of the "window period" occupants. Thus, the court answered the argument of the *Lower Manhattan Loft Tenants* petitioners by expressly indicating that the premise of their argument, i.e., that Loft Law coverage is not initially contingent upon primary residency, was flawed.

Any doubt that the Court of Appeals fully understood the jurisdictional significance of its decision in *Lower Manhattan Loft Tenants (supra)* should be dispelled by its further observation that in enacting article 7-C, "the Legislature intended to encourage conversation to conforming residential use only to the extent that there was in fact residential use of the particular space within the meaning of the article, which, as we have seen, required that the space be occupied as 'the residence or home' of the occupant (§ 281 [1])." *(Matter of Lower Manhattan Loft Tenants v New York City Loft Bd. supra,* at 305.) What the court recognized was that when a building is deemed an interim multiple dwelling pursuant to the jurisdictional provisions of section 281 (1) of the Multiple

Dwelling Law, the landlord is thereby obligated to make costly improvements in the premises and will eventually be bound by the rent regulations contained in the Emergency Tenant Protection Act of 1974. The rationale for imposing these burdens on the property owner is that the housing shortage will thereby be alleviated. However, where the initial "window period" tenancies are not primary in nature and, therefore, do not reflect the occupants' need for primary residential accommodations, it would appear highly questionable whether there exists an adequate predicate for the imposition upon the landlord of the burdens entailed by article 7-C. Indeed, the Court of Appeals has implied rather pointedly that to construe interim Multiple Dwelling Law § 281 (1) (iii) so as to eliminate the jurisdictional primary residency requirement would throw the constitutionality of article 7-C into doubt. *(Matter of Lower Manhattan Loft Tenants v New York City Loft Bd., supra,* at 306.)

Having made these observations, I would readily concede that there are sound policy reasons why primary residency should not be made a condition of Loft Law coverage since residential tenants had no legal status during the "window period" and may well have difficulty proving the primary nature of tenancies they were once at pains to conceal. In addition, there is certainly an argument to be made that alleviation of the housing shortage would be most effectively accomplished if the Loft Law were construed to maximize the conversion of loft space to residential use and only afterwards to impose a primary residency requirement. Although I believe that the Court of Appeals has already expressed itself on these points, it is true, as the majority points out, that it did so at a time when the jurisdictional scope of article 7-C was not directly at issue, and that it did not then benefit from full appellate presentation. The matter, which is one of considerable importance to loft tenants, deserves further consideration by the Court of Appeals.

I, therefore, dissent based upon what I take to be the import of *Lower Manhattan Loft Tenants (supra)* and would grant the petition to the extent of remanding the matter to the Loft Board for reconsideration.